UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

JEREMY C. MOONEY,

        Defendant.

Case No. 2:22-cr-201(1)
JUDGE EDMUND A. SARGUS, JR.

## OPINION AND ORDER

Defendant Jeremy C. Mooney is charged in a two-count indictment with deprivation of rights under color of law, in violation of 18 U.S.C. § 242. (ECF No. 3.) Defendant moves to dismiss the Indictment based on the destruction of evidence. (Mot. to Dismiss Indictment, ECF Nos. 34; Supp. to Mot., ECF No. 36.) The Government opposes Defendant's motion. (ECF No. 41.) On July 26, 2023, the Court held a hearing on Defendant's motion. (Minute Entry, ECF No. 56.) The Court heard testimony from Pike County Sheriff's Office ("PCSO") Deputy Daniel Carroll, PCSO Lieutenant Adam George Ball, PCSO Dispatcher Anthony Bickers, and former PCSO Sheriff James Nelson. (*See* Tr., ECF No. 57.) The parties also presented PCSO's retention policy, which the Court accepted into evidence. (*Id.* at 77:16-20.) Defendant's motion is now ripe for review. For the following reasons, the Court **DENIES** Defendant's motion.

### I.     BACKGROUND

On October 19, 2022, Defendant was indicted for violating 18 U.S.C. § 242, Deprivation of Rights under Color of Law. (Indictment, ECF No. 3.) As set forth in the Indictment, on November 18, 2019, Defendant, a former PCSO Patrol Officer, allegedly struck and pepper sprayed a detainee (hereinafter "TF") without any legitimate law enforcement purpose, resulting

1

in bodily injury to TF. (*Id.*) On June 22, 2023, Defendant filed the pending motion to dismiss the Indictment, arguing that the Government's failure to preserve the entirety of the video footage from TF's time at PCSO violates Defendant's due process rights, thereby warranting a dismissal of the Indictment. (ECF No. 34.) The Government opposes Defendant's motion (ECF No. 41), and the Court held a hearing on the motion on July 26, 2023 (Minute Entry, ECF No. 56).

Testimony during the motion hearing provided further details surrounding the events in question. On November 18, 2019, PCSO Deputy Daniel Carroll was on duty as a road deputy. (Tr. at 8:14-9:3.) Deputy Carroll testified that PCSO received a call from Defendant, who was working as a transportation corrections officer, asking for assistance escorting TF from the Butler County jail to the sheriff's office. (*Id.* at 9:6-25.) Defendant indicated that TF had been acting out in the transportation van. (*Id.* at 9:13-15.) Deputy Carroll testified that this was not TF's first interaction with the PCSO, referring to him as a "regular." (*Id.* at 12:24-13:7.) He testified further that TF was "mouthy," had a history of drug use, and was sometimes violent, citing an incident the previous week where TF bit another officer. (*Id.* 13:4-10, 23:7-8.)

When Deputy Carroll arrived at the sheriff's office on the evening of November 18, 2019, he witnessed Defendant pull up in the transportation van. (*Id.* at 10:7-10.) Deputy Carroll assisted Defendant escort TF from the transportation van into the sheriff's office's holding area. (*Id.* at 10:10-14.) When escorting TF into the holding area, Deputy Carroll observed Defendant walk TF to a restraint chair outside the van, in which TF, appearing calm, sat in without issue. (*Id.* at 10:10-14, 27:14-22.) Defendant then secured TF's upper body and torso in the chair, but was unable to fully secure TF's legs, as the chair's leg restraint was broken. (*Id.* at 12:7-15.). Deputy Carroll testified that, after TF was placed in a restraint chair, he did not perceive him as a danger to other

2

officers or himself. (*Id.* at 28:1-29:17.) He further testified that once a detainee is placed in a restraint chair, no further use of force is warranted. (*Id.* at 30:7-10.)

Deputy Carroll then returned to his patrol car, which was parked on the other side of the PCSO. (*Id.* at 13:11-15.) Back at his car, Deputy Carroll received a call from Sergeant Stansbury, who was also on duty at the sheriff's office. (*Id.* at 14:19-22.) In this call, Officer Stansbury directed Deputy Carroll to return to the front of the sheriff's office because Defendant had pepper sprayed TF. (*Id.* at 14:20-25.) When Deputy Carroll returned to the other side of the sheriff's office, he saw TF, still restrained in the chair, tipped backwards on the ground. (*Id.* at 15:19-21.) Deputy Carroll and Sergeant Stansbury then placed TF upright and took him inside for booking. (*Id.* at 16:1-2.)

TF, still restrained, was placed in the common room in the sheriff's office. (*Id.* 16:24-17:2.) Deputy Carroll then left TF in the common room with Defendant. Near the end of Deputy Carroll's shift, Deputy Carroll received a phone call from Defendant. (*Id.* at 18:23-19:5) Defendant stated that TF had spit on him, leading Defendant to strike him. (*Id.*) Following this call, Deputy Carroll returned to the common room, where he saw a restrained TF bloody and chained to a door. (*Id.* at 21:8-14.)

PCSO Lieutenant Adam George Ball was also on duty on the evening of November 18, 2019. At the time, he was a PCSO Corporal who assisted with investigations and managing evidence and crime scenes. (*Id.* at 36:13-17.) Lieutenant Ball testified that he spoke with Defendant following the pepper spraying and striking of TF. (*Id.* at 46:10-21.) According to Lieutenant Ball, Defendant told him that he struck a detainee, which Defendant considered to have been a possible mistake. (*Id.* at 46:18-21.)

3

Lieutenant Ball also spoke with TF following Defendant's uses of force. (*Id.* at 47:10-13.) At first, TF appeared agitated. (*Id.* at 47:14-15.) After calming TF down, Lieutenant Ball took TF to the wash bay to clean him up. (*Id.* at 48:5-8.) TF was then placed in an ambulance and taken to the hospital. (*Id.* at 49:5-7.)

The Court also heard testimony from PCSO Dispatch Supervisor Anthony Bickers. He testified that, following Defendant's interactions with TF, he was instructed to pull security camera footage of Defendant's uses of force. (*Id.* at 56:13-16.) Dispatch Supervisor Bickers explained that he watched the footage from the moment TF arrived at the sheriff's office until EMS was called after he sustained injuries, clipping the instances of Defendant using force on TF while fast forwarding through the remaining footage. (*Id.* at 57:15-58:4.) Dispatch Supervisor Bickers only clipped and exported the uses of force—that is, little else of the footage from TF's stay at the sheriff's office was preserved apart from the instances where Defendant exercised force against TF. (*Id.*) According to Dispatch Supervisor Bickers, the unclipped footage merely consisted of Defendant "standing around on his phone, doing various jail tasks, sorting paperwork, things like that. [TF] spinning himself around in the restraint chair." (*Id.* at 68:12-18.)

Dispatch Supervisor Bickers also testified that he was unaware of PCSO's retention policy, as well as the fact that PCSO's video system overwrites itself after seven days. (*Id.* at 61:23-24, 62:9-11.) He further stated that he did not export the entirety of TF's time at the sheriff's office because the size of such a file would crash PCSO's system. (*Id.* at 60:23-24.) In addition, he testified that he had never received training on use of force investigations, nor was he ever provided examples of what to look for. (*Id.* at 56:20-22.) Finally, he stated that he did not take steps to actively delete any video footage from the period TF was at PCSO, nor is he aware of anyone else having made such an effort. (*Id.* at 70:2-7.)

The last person to testify at the hearing was former Pike County Sheriff James Nelson. Sheriff Nelson testified that he was familiar with PCSO's retention policy, which he believed covered video footage. (*Id.* at 78:15-17, 88:11-13.) He testified further that PCSO's goal in pulling the video footage of Defendant's interactions with TF was to pull *all* of the footage capturing TF's time in custody, not simply the instances where Defendant used force. (*Id.* at 79:21-80:3.) Additionally, he testified that he watched the clips, thinking they covered the entire relevant period, and later used the videos in Defendant's administrative proceedings. (*Id.* at 81:15-18, 84:10-12.)

Sheriff Nelson also explained that he forwarded the clipped footage of the incident, along with witness statements, to the Pike County Prosecutor, Mr. Junk. (*Id.* at 84:10-13.) The matter was subsequently referred to the FBI and the U.S. Attorney's Office. (*Id.* at 79:5-9.)

Sheriff Nelson testified to PCSO's role in the FBI's criminal investigation and the U.S. Attorney's Office's prosecution of Defendant. He stated that PCSO did not partner with the FBI during their criminal investigation. (*Id.* at 89:9-11.) Nor did PCSO assign one of its deputies to work the FBI's criminal investigation. (*Id.* at 89:12-14.) And when the FBI interviewed witnesses, the FBI did not invite PCSO to participate. (*Id.* at 89:15-18.) Sheriff Nelson stated further that PCSO did not have access to the FBI's criminal investigative file, and when the FBI needed records from PCSO, they did so by a federal Grand Jury subpoena. (*Id.* at 89:19-90:5.) Sheriff Nelson also testified that PCSO did not consult with the U.S. Attorney's Office prior to Defendant's indictment. (*Id.* at 90:9-12.)

## II.     LAW & ANALYSIS

Defendant argues that PCSO—and by extension the United States—violated Defendant's Fifth Amendment Due Process rights by destroying materially exculpatory evidence in bad faith. (*See* Mot., ECF No. 34; Supp. to Mot., ECF No. 36.) The Court disagrees.

5

In the seminal case of *Brady v. Maryland*, the Supreme Court held that the suppression of materially exculpatory evidence violates a defendant's due process rights regardless of the good faith or bad faith of the prosecution. 373 U.S. 83, 87 (1963). Subsequent to *Brady*, the Supreme Court articulated a two-part framework for determining constitutional materiality: "evidence must both possess [1] an exculpatory value that was apparent before the evidence was destroyed, and [2] be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). If a defendant satisfies both elements, the "destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith." *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

A different test, however, applies "where the government fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to defendant . . . ." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988)). In such a scenario, a defendant must show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.*

As an initial matter, the Court notes that Defendant's motion appears to argue that dismissal of the Indictment is warranted under both tests—that is, regardless of whether the Court characterizes the lost video footage as materially exculpatory or merely potentially exculpatory, the Indictment should be dismissed. (*See* Mot. at 5-10, ECF No. 34.) In response to Defendant's motion, the Government raises two independent grounds for its denial. First, the Government contends that *Brady* and its progeny are inapplicable because they apply only to evidence over

which the prosecution team has control, and the U.S. Attorney's Office never had control of the complete video footage from TF's time at the sheriff's office. (ECF No. 41 at 4-7.) Second, the Government asserts that Defendant cannot make any of the showings necessary to establish a *Brady* claim. (*Id.* at 8-11.)

The Court begins its analysis with the Government's first argument against Defendant's motion. Under *Brady*, the prosecution has a duty "to disclose material evidence that is favorable to the defendant over which the prosecution team has control." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). The corollary to this rule is that "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *Id.* (quotation omitted). Courts have recognized that the "prosecution team" may include outside agencies that take part in a "joint investigation" with the prosecuting agency. *See, e.g.*, *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006). That is to say, where agencies are working jointly, the Sixth Circuit has suggested that the prosecutor has "a duty to discover 'favorable evidence known to . . . others acting on the government's behalf in the case.'" *Sutton v. Carpenter*, 617 F. App'x 434, 441–42 (6th Cir. 2015) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). *Brady* does not, however, "impose[e] a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010) (citing, *inter alia*, *Moon v. Head*, 285 F.3d 1301, 1310 (11th Cir. 2002)). In *Bagley*, the Sixth Circuit cited approvingly to the Eleventh Circuit's decision in *Moon*, where the court declined "to impute to a Georgia prosecutor information that Tennessee authorities possessed regarding a defendant, where there was no evidence that (1) the Georgia and Tennessee agencies shared any resources or labor, (2)

7

the two agencies worked together during the investigation of the defendant, or (3) the Tennessee authorities were under the direction or supervision of the Georgia prosecutor." *Id.*

Here, the Government contends that *Brady* is inapplicable because the record provides no evidence suggesting that PCSO or the Pike County Prosecutor's Office formed a part of the prosecution team. As Sheriff Nelson testified, PCSO did *not* partner with the FBI in the FBI's criminal investigation of Defendant; PCSO did *not* assign a deputy to work the FBI's criminal investigation; PCSO was *not* present during the FBI's interview of witnesses; the FBI did *not* have direct access to PCSO's files related to the incident; and PCSO did *not* consult with the FBI or the U.S. Attorney's Office prior to the issuance of Defendant's Indictment. The record reflects an absence of evidence similar to that in *Moon*—that is, there is little evidence that PCSO or the Pike County Prosecutor's Office (1) shared resources or labor with the Government, (2) worked together with the Government during its investigation of Defendant, and (3) were under the direction or supervision of the Government. And Defendant's arguments in its motions and during the hearing do little to show otherwise. As such, the Court is inclined to agree with the Government's position on this issue. But the Court need not decide Defendant's motion under the above analysis, as the Court finds that Defendant cannot make the showings necessary to establish a *Brady* violation.

The Court begins its *Brady* analysis with the test from *Trombetta*: The exculpatory value of the evidence must be apparent before its loss or destruction, and the defendant must be unable to get comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489. Defendant carries the burden of establishing these elements. *See United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) (placing burden on defendant to show that withheld materials contained material exculpatory evidence), *cert. denied*, 506 U.S. 1083 (1993).

At the motion hearing, Defendant argued that the lost video footage has exculpatory value because some of the footage may show additional "activity" by TF while he was in custody. (*See* Tr. at 107:18-23.) The Court is not persuaded. Defendant has failed to provide any specifics describing this hypothetical "activity" and how it would exculpate Defendant. Moreover, nothing in the record suggests the video's exculpatory value was apparent before its loss. What the record does show is that Dispatch Supervisor Bickers testified to clipping all observed instances of Defendant using force against TF while declining to export the remaining footage—footage depicting Defendant engaged in a variety of innocuous acts and a restrained TF pushing himself in a circle in the holding area. (*See* Tr. at 68:12-18.) The Court finds Dispatch Supervisor Bicker's testimony to be credible. As such, the Court has little reason to believe this lost footage has exculpatory value in light of the preserved footage and Sixth Circuit caselaw addressing behavior similar to Defendant's conduct. *See Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[A]s we have previously held, striking a neutralized suspect who is secured by handcuffs is objectively unreasonable."); *Shumate v. Cleveland*, 483 F. App'x 112, 114 (6th Cir. 2012) (where a police officer punched a handcuffed arrestee after being spit on, the court held that a jury could find the officer's use of force to be excessive); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (finding it "clearly established that the [police officer's] use of pepper spray against [the arrestee] after he was handcuffed and hobbled was excessive"). Accordingly, Defendant has failed to meet its burden of showing the lost video footage has exculpatory value that was apparent before PCSO's video system erased the footage.

Defendant also cannot establish a *Brady* violation under the second test, which applies to "evidence whose exculpatory value is indeterminate and only 'potentially useful' to defendant." *Jobson*, 102 F.3d at 218 (citing *Youngblood*, 488 U.S. at 57–58). This is so not only because

Defendant has failed to show the exculpatory value of the lost footage was apparent before its loss, but also because the record indicates that the Government did not act in bad faith in its failure to preserve the lost footage. *See id.* (outlining three factors a defendant must satisfy to prevail on a *Brady* claim involving spoliated evidence whose exculpatory value is indeterminate).

Defendant cannot show that PCSO, the Pike County Prosecutor's Office, the FBI, or the U.S. Attorney's Office acted in bad faith in failing to preserve the entirety of the video footage capturing TF's time in custody at the sheriff's office. To establish bad faith, "a defendant must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" *Id.* (quoting *Trombetta*, 467 U.S. at 488). Negligence or even gross negligence on the part of the government does not amount to bad faith. *Id.*

Here, the lost footage was not erased as a result of malice, but rather due to PCSO's video system overwriting itself after seven days—an overwriting process that was unknown to Dispatch Supervisor Bickers during the relevant period. Moreover, to the extent Defendant contends that PCSO's alleged violation of its retention policy indicates bad faith, this argument also falls short. Sheriff Nelson testified that it was his intention to pull all the footage involving TF, and he believed that Dispatch Supervisor Bickers did so after reviewing the clipped footage. And Dispatch Supervisor Bickers testified that he was instructed only to pull the footage capturing Defendant's uses of force, which he believes he did. He then testified that he did not actively delete any footage, and he was unaware of anyone else having done so. At most, PCSO was merely negligent in failing to preserve the lost footage and failing to better train Dispatch Supervisor Bickers; but PCSO took no affirmative action to destroy the footage. Against this uncontested record, the Court finds no evidence of bad faith in this case. Accordingly, the Court finds the Government's failure to preserve the lost footage does not amount to a due process violation in this case, and therefore

Defendant's request to dismiss the Indictment is **DENIED**. Furthermore, given the absence of a constitutional violation, the Court **DENIES** Defendant's alternative request to suppress the preserved video footage.

### III.     CONCLUSION

For the foregoing reasons, Defendant's Motion to dismiss the Indictment is **DENIED**. (ECF No. 34.) The preserved videos documenting TF's period in custody at the sheriff's office are **ADMISSIBLE**.

**IT IS SO ORDERED.**


**8/2/2023**                                                                  s/Edmund A. Sargus, Jr.
**DATE**                                                                     **EDMUND A. SARGUS, JR.**
                                                                                      **UNITED STATES DISTRICT JUDGE**